UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANTHONY PALIE, DAKOTA BEDELL, CARL CORBO, ANNABEL GOULD, DOLORES THOMPSON, and BRIDGETTE WINKELMANN, on behalf of themselves and all others similarly situated,<br><br>                                    Plaintiffs,<br><br>          v.<br><br>EZ FESTIVALS LLC; MADE EVENT LLC; AVANT GARDNER, LLC; JURGEN BILDSTEIN, and DOES 1 through 50, inclusive,<br><br>               Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

        Plaintiffs ANTHONY PALIE, DAKOTA BEDELL, CARL CORBO, ANNABEL

GOULD, DOLORES THOMPSON, and BRIDGETTE WINKELMANN (collectively,

"Plaintiffs"), bring this action on behalf of themselves, and all others similarly situated, and file

this Class Action Complaint against defendants EZ FESTIVALS LLC ("EZ Festivals"), MADE

EVENT LLC ("Made Event"), AVANT GARDNER, LLC ("Avant Gardner), and JURGEN

BILDSTEIN ("Bildstein," referred to collectively herein with EZ Festivals, Made Event, and

Avant Gardner as "Defendants") and DOES 1 through 50, inclusive. Plaintiffs allege the

following based on information and belief, the investigation of counsel, review of public

documents, and personal knowledge as to the allegations pertaining to themselves.

## <u>INTRODUCTION</u>

        1.        This class action lawsuit seeks redress for Defendants' knowing failure to

properly organize, prepare, and provide ticket purchasers and attendees of the Electric Zoo New

York Music Festival 2023 (the "Electric Zoo Festival" or the "Festival") with the experience the

Defendants extensively promoted and marketed as being a safe, multi-day festival to take place on September 1-3, 2023 in New York City, New York, on Randall's Island.  The Festival was to feature, among other things, three full days of specified musical acts performing on multiple stages; food vendors; general amenities such as merchandise tables, portable toilets (port-a-potties), and free water refill stations; and a host of VIP and other amenities at additional cost, including, among other things, shuttle and ferry service to and from the festival; access to preferred VIP areas; air-conditioned trailers with flush toilets; and passed hors d'oeuvres.

2.      As reported on social media and online news sources in its aftermath, the  Festival was a disorganized fiasco, and did not offer the experience the Defendants had promised, which became apparent immediately upon the attendees' arrival.

3.      By its conclusion on September 3, 2023, the Electric Zoo Festival quickly achieved media notoriety because of multiple problems:

(a)      The performances scheduled for Friday, September 1, 2023, were canceled mere hours before the Festival gates were scheduled to open, due to purported supply chain issues that somehow prevented completion of the facilities.

(b)      On Saturday, September 2, 2023, in a post on Defendants' social media accounts at approximately 11:28 AM (shortly before the second day of the Festival was scheduled to open), Defendants conceded that they were still not ready to begin admitting guests to the Festival at the 1:00 PM scheduled opening time, but instead were pushing back the opening time to 3:00 PM.  The artists scheduled to perform between 1:00 PM and 3:00 PM were not rescheduled.

(c)     Patrons who had not seen the notification or were already enroute and had arrived for the originally scheduled opening had to wait two hours before the gates opened.  Even once the gates were opened, additional delays prevented guests from reaching the stages to hear the scheduled acts. Later arriving guests confronted immense lines, with many waiting an hour or more just to enter, and guests who were required to pick up wristbands at the will-call area waiting several hours in line – while standing in the hot sun without access to water or restrooms (and missing most of the music that was performed that day).

(d)     Furthermore, upon opening on Saturday, the main stage was still under construction until approximately 5:00 PM, and even then, the so-called completed stage bore no resemblance to the elaborate sets advertised by Defendants in their promotional materials.  The additional stages of the Festival likewise were only partially completed, lacking lighting and utilizing display screens that were either wholly or substantially inoperative.

(e)     As was the case with the stages, the Festival grounds were also deficient and disorganized, with shoddily constructed and unsafe viewing areas, exposed cables, insufficient trash receptacles, inadequate and unsanitary bathroom facilities, and missing or confusing signage.   Moreover, after the shortened second day's musical acts concluded, Defendants failed to properly manage the departing crowds, causing unsafe conditions and

immense delays, and effectively trapping thousands of attendees on
Randall's Island for hours on end.

(f)     The events of Friday and Saturday were surpassed, however, by the
disaster that unfolded on Sunday, September 3, 2023.  In addition to
unsafe conditions caused by exposed cables, inadequate trash receptacles,
clogged port-a-potties, and insufficient water supplies on a 90-degree day,
Defendants oversold that day's festivities by approximately 7,000 tickets,
according to estimates by the New York City Police Department.  Given
that the venues were already overcrowded, at approximately 6:30 PM,
Defendants decided to bar additional guests from entering the Festival,
requesting those not on site to refrain from coming.  However, thousands
of people were still waiting at the gates to enter.  At 7:30 PM, Defendants
announced that even those awaiting entry would not be admitted. These
patrons did not, however, simply turn around and leave.  Instead,
thousands rushed through the gates, overwhelming the inadequately
trained security staff and creating chaos throughout the grounds of the
Festival.  As a result, beyond merely making the Festival impossible to
reasonably enjoy, patrons actively feared for their safety, and were
effectively trapped on Randall's Island due to the crowds pushing in every
direction.

(g)     Additionally, guests reported a range of problems with Defendants'
staffing on both Saturday and Sunday, from staff being unfamiliar with the
layout of the Festival grounds and therefore unable to direct patrons to the

correct areas, to security guards soliciting bribes from attendees (to allow

unauthorized people to enter VIP areas and to move individuals to the

front of security and will-call lines), to guards being verbally – and, at

times, physically – abusive to the festivalgoers.  In sum, Defendants did

not provide adequate staffing or training to its employees for a festival of

this scope – where approximately 42,500 patrons were expected.

4.     In light of the cancellations; truncated Festival hours; and crowded, unsafe, and

unsanitary conditions, Plaintiff and other attendees suffered financial damages associated with

the purchase of the tickets and/or other expenditures associated with the Electric Zoo Festival

depending on the ticket packages purchased.

5.     Plaintiffs bring this class action on behalf of all ticket buyers and/or Festival

attendees wronged by Defendants, and seek damages of no less than $18,000,000 (eighteen

million dollars), on behalf of themselves and the Class.

## PARTIES

6.     Plaintiff Anthony Palie  ("Mr. Palie") is, and, at all times relevant to action was, a

resident of Boston, Massachusetts, and a citizen of the Commonwealth of Massachusetts.

7.     Plaintiff Dakota Bedell ("Mr. Bedell") is, and, at all times relevant to action was,

a resident of Eau Claire, Wisconsin, and a citizen of the State of Wisconsin.

8.     Plaintiff Carl Corbo ("Mr. Corbo") is, and, at all times relevant to action was, a

resident of Torrington, Connecticut, and a citizen of the State of Connecticut.

9.     Plaintiff Annabel Gould ("Ms. Gould") is, and, at all times relevant to action was,

a resident of New York, New York, and a citizen of the State of New York.

10.     Plaintiff Dolores Thompson ("Ms. Thompson") is, and, at all times relevant to action was, a resident of Kissimmee, Florida, and a citizen of the State of Florida.

11.     Plaintiff Bridgette Winkelmann ("Ms. Winkelmann") is, and, at all times relevant to action was, a resident of Eau Claire, Wisconsin, and a citizen of the State of Wisconsin.

12.     Upon information and belief, Defendant EZ FESTIVALS LLC ("EZ Festivals") is, and, at all times relevant to this action was, Limited Liability Company organized under Delaware law, with its principal place of business in the State of New York.

13.     Upon information and belief, Defendant MADE EVENT LLC ("Made Event") is, and, at all times relevant to this action was, Limited Liability Company organized under Connecticut law, with its principal place of business in the State of New York.

14.     Upon information and belief, Defendant Made Event owns and operates Defendant EZ Festivals.

15.     Upon information and belief, Defendant AVANT GARDNER, LLC (Avant Gardner") is, and, at all times relevant to this action was, Limited Liability Company organized under New York law, with its principal place of business in the State of New York.

16.     Upon information and belief, Defendant Avant Gardner owns and operates Defendant Made Event.

17.     Defendant JURGEN BILDSTEIN ("Bildstein") is an individual residing in and regularly doing business within the State of New York.

18.     Upon information ben belief, Defendant Bildstein owns and controls Defendants Avant Gardner, Made Event, and EZ Festivals.

19.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 50, inclusive, are currently unknown to

Plaintiffs, who therefore sue Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants designated herein as DOES is legally responsible in some manner for the events and happenings referred to herein and caused injury and damage proximately thereby to Plaintiffs as hereinafter alleged. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES when the same have been fully ascertained.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member (the class, including class representatives, being comprised of citizens of states across the United States) is a citizen of a state different from Defendants.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial district, including but not limited to the Electric Zoo Festival.

## FACTUAL BACKGROUND

### The Marketing and Advertising of Electric Zoo Festival

22.     Defendants marketed and advertised Electric Zoo as a three-day festival scheduled to take place over the Labor Day holiday weekend (September 1-3, 2023).

23.     Attendees at the Festival could purchase individual day tickets for approximately $150, or ticket packages for all three days for prices ranging from approximately $230 to $380 which could include, among other things, ferry and shuttle service to and from the venue at an additional cost.

24.     Defendants also marketed and advertised numerous additional VIP amenities available to Festival attendees for additional fees.  These included, without limitation, (i) a premium entrance to the Festival enabling patrons to skip the entry queue, (ii) premium viewing galleries of all six of the Festival stages; (iii) access to VIP flush toilets in air-conditioned trailers; (iv) complimentary cell phone charging stations; (v) complimentary passed hors d'oeuvres; and (vi) an onsite host for VIP guests.

25.     The three full days of musical acts were advertised to include close to 100 artists, with main stage live performances advertised from 3:00 PM to 11:00 PM on Friday, September 1, 2023, and from 1:00 PM to 11:00 PM on Saturday and Sunday, September 2-3.

26.     When announcing the line-up of artists in June 2023, Defendants emphasized the expansion of the Festival with new stage buildouts, the introduction of a "MegaMirage" stage, "larger-than-life experiences" with immersive production and audiovisual effects, and the integration of AI into the Festival.

27.     From August 28, through August 31, 2023 – the day before the Festival was slated to begin – Defendants posted videos on their social media feed with renderings of a number of the Festival stages.

28.     Among these, the Convergence, the main stage, was depicted with a green and purple landscape on panels at the back of the stage and three sets of blue and purple lights mounted on arches above the crowd; the MegaMirage video showed a brightly lit arched stage, with strobes and laser beams above, and a row of flames surrounding the stage; and the Morphosis promotion showed three sets of transparent cubes of differing sizes with green lasers beamed into the sky from atop the structures.

29.    As described below, *see infra* ¶¶ 48-49, the stages that were actually built – when finally completed midway through the weekend – bore little resemblance to the promised experiences.

30.    Upon information and belief, Defendants sold tens of thousands of ticket packages to Electric Zoo in total, and the event was ultimately oversold by approximately 7,000 tickets, beyond the planned capacity approved by the City of New York, according to estimates by the New York City Police Department.

### The Electric Zoo Festival's Failures

31.    Defendant Avant Gardner purchased Defendant Made Event in June 2022, thereby acquiring the Electric Zoo Festival.

32.    Upon information and belief, Avant Gardner did not become involved in the operation of the 2022 Electric Zoo Festival, which proceeded without any of the problems that developed in 2023.

33.    According to press reports, Defendant Avant Gardner fired all of the Made Event staff after the 2022 Electric Zoo Festival, thus losing the institutional expertise developed by the Made Event staff over several years.[1]

34.    Upon information and belief, Defendants had failed to begin planning the logistics of the Festival until approximately June 2023, whereas in prior years such planning began approximately nine months in advance.  As a result, Defendants were scrambling throughout the summer to hire the requisite staff to build the stages, provide security for the event, and oversee operations.

---

[1] https://pagesix.com/2023/09/09/brooklyn-mirages-very-late-planning-to-blame-for-electic-zoo-chaos/.

35.     Upon information and belief, due to various construction delays, by the end of the day on Thursday, Thursday, August 31, 2023, the Festival had not received the requisite permits from New York City that would allow them to open the Festival on time.

36.     On Thursday, August 31, 2023, at 10:17 PM, Defendants nonetheless posted on the Festival's social media accounts: "Get your rest. We'll see you tomorrow on the island," as if everything were moving along according to plan.

37.     Upon information and belief, Defendants knew at the time of this posting that the facilities would not be ready in time for the opening of the Festival planned for Friday, September 1, 2023, at 3:00 PM; to the contrary, Defendants were still in the process of constructing the Festival stages.

38.     At 11:37 AM on Friday, September 1, 2023, Defendants posted on the Festival's social media accounts that Friday's show was canceled due to so-called supply chain issues that prevented completion on construction of the main stage.

39.     Defendants did not send this notification via email to all ticketholders.  Rather, they posted the update via social media, leaving to chance whether attendees would receive the notification prior to heading to the Festival.  As a result, many attendees did not see the notification until they were on their way to the Festival site.

40.     As indicated below, *see infra* ¶¶ 62-66, Defendants have issued statements suggesting they planned to issue refunds to all Friday ticketholders and partial credit for multi-day ticketholders, as well as refunds for ferry and bus ticketholders, but as of this filing, no such refunds have been issued.

41.     On Saturday, September 2, 2023, Defendants were still not ready to begin admitting guests to the festival at the 1:00 PM time set for opening of the gates.

42.     At approximately 11:28 AM that morning, Defendants posted an update on the Festival's social media accounts, pushing back the opening time of the Festival from 1:00 PM to 3:00 PM.  The artists scheduled to perform between 1:00 PM and 3:00 PM were not rescheduled.

43.     Defendants have not offered to compensate festivalgoers for the truncation of Saturday's proceedings and the cancellation of certain acts due to the delayed opening.

44.     Because Defendants did not send an email blast to all attendees, many patrons did not see the notification before heading to the Festival, as was the case with the Friday cancelation notification.  Those who did not see the update arrived at 1:00 PM and then waited two hours before the gates were opened.  Those that did delay their arrival to the Festival were then confronted with lines for entry to the Festival, with many guests reporting wait-times that exceeded one hour.  During this time, Defendants provided no access to restroom facilities or water.

45.     Guests who were required to pick up wristbands at the will-call area – who were told they would have access to pick up their wristbands beginning at 12 noon on Saturday[2] – had to wait several hours in line, standing in the hot sun without access to water or restrooms – and then missing most of the music that was performed that day.

46.     Even after being admitted on Saturday afternoon, delays prevented patrons from reaching the stages to hear the scheduled acts because the grounds were already overcrowded.  The Festival lacked appropriate signage and Festival staff were ill-informed as to the layout of the Festival and unable to direct guests to the different stages. Security staff solicited bribes to move people to the head of the will-call line, entry line, or into the VIP areas.

---

[2] https://electriczoo.com/festival-info/faqs/.

47.     Upon entering the Electric Zoo Festival, Plaintiffs and attendees were shocked to find that the experience promised by Defendants on their website and other marketing materials differed markedly from the conditions on the ground.

48.     The main stage ("The Convergence") was still under construction until approximately 5:00 PM, and even then, the so-called completed stage bore no resemblance to the elaborate sets advertised by Defendants in their promotional materials. Instead of the elaborate set promised by Defendants, attendees found a bare-bones set up with little more than the actual stages, a few panels of lights, and only one (of the promised three) sets of overhead lighting displays, which were still being put in place by workers on cranes after the area had opened for guests.  Additionally, the lighting and video monitors were glitching or not working at all.

49.     The additional stages of the Festival likewise were only partially completed and lacked lighting and fully operative display screens.  Additionally, effects such as fog machines, pyrotechnics, and rockets were only used in a handful of performances, contrary to what was advertised.

50.     The conditions within the Festival grounds presented another set of problems. Guests encountered overflowing trash cans; insufficient bathroom facilities, with inadequate supplies of toilet paper and water/hand sanitizer; shortages of drinking water, with only three refill stations on the entire Festival's grounds; and general overcrowding, leading to excessive lines for everything from port-a-potties to food vendors, and making it difficult to move from one area to another.

51.     Additionally, wiring and cables for the musicians' equipment was exposed, rather than covered by rubber matting, creating hazards in various locations.

52.     The so-called VIP areas were not properly staffed.  Security guards were soliciting bribes to allow festivalgoers to enter those areas, even if they had not purchased VIP access. Thus, those guests who did purchase VIP perks – such as access to separate viewing areas and air-conditioned trailers with flush toilets – were forced to wait in long lines and endure overcrowding, undermining the purpose of the VIP passes to begin with.

53.     Based on the issues they had encountered upon arrival at Electric Zoo Festival, and the unsafe and unsanitary conditions within the grounds, many attendees departed the Festival early or left in order to avoid being stuck in crowds trying to leave Randall's Island, thereby missing specified musical acts.

54.     Those that remained through the end of the second day's acts suffered separate travails: Defendants' disorganization and affirmative acts, including the closure of certain exits from the Festival on Saturday night, led to immense crowding and delays causing many guests to be trapped on Festival grounds for hours after the acts concluded, without aid from Festival staff.

55.     The events of Saturday were surpassed, however, by the disaster that unfolded on Sunday, September 3, 2023.  In addition to unsafe conditions caused by exposed electrical cables, overflowing trash receptacles, clogged port-a-potties, and insufficient water supplies on a 90-degree day, Defendants oversold that day's festivities by approximately 7,000 tickets, according to estimates by the New York City Police Department.

56.     Given that the venues were already overcrowded, at approximately 6:35 PM, Defendants announced on their social media sites that they had "reached the venue's capacity earlier than anticipated," and would not be admitting any additional attendees.  They requested anyone who was still on their way to refrain from coming.

57.     At approximately 6:45 PM, Defendants updated their announcement regarding access to the Festival, suggesting that the earlier notice only applied to patrons who are not yet on Randall's Island.

58.     Meanwhile, thousands of individuals were already waiting outside of the gates by this time, with no explanation or instructions as to what would occur.  In the absence of explanation or direction by Defendants, the group of thousands of concertgoers began to grow agitated as doubts grew as to whether and when they would be admitted to the Festival.

59.     At 7:32 PM, Defendants issued another announce via social media, stating, "entry to the event is now closed and will not re-open."

60.     Thereafter, when Defendants made no reasonable efforts to control the assembled crowds, chaos ensued.  People waiting to enter rushed through the gates and created even more crowding and confusion throughout the grounds of the Festival.  The Festival's inadequately trained security personnel were unable or unwilling to control the situation, with throngs of people swept along by the crowds trying to avoid being trampled.

61.     Patrons inside the Festival feared for their safety.  In addition to the danger of the onrushing crowds, individuals entering the gates were not screened by security.  Additionally, due to the crowds pushing in every direction, attendees were unable to easily leave Randall's Island.

62.     On September 13, 2023, Defendant Made Event sent an email to Festival guests to provide an update on refunds for Friday, September 1 and Sunday, September 3.  The email stated:

>  We have been working tirelessly with our partners for the past
>  week to reach the best solution for you. We're not prepared to offer
>  specifics on the refund process at this time but we ask for your

patience as we navigate the process.  We'll be in touch with the
specifics as soon as possible.

63.     No further update has been provided as of this filing.

64.     Defendants have yet to compensate Plaintiffs and other Class members for the
canceled portions of the Festival.

65.     Additionally, Defendants have not offered any refund at all for Saturday's events,
despite opening two hours later than scheduled, which truncated the advertised programming and
caused additional delays for guests waiting to enter the Festival; and for permitting overcrowding
that led to unsafe and unsanitary conditions.

66.     Plaintiffs and other Class members sustained damages as a direct and proximate
result of Defendants' negligence and other wrongful conduct and omissions in connection with
the sale of tickets to and other items associated with the Electric Zoo Festival, and promotion and
organization of the Electric Zoo Festival.

**Plaintiffs' Experiences**

67.     Plaintiffs and other Class members relied on the Defendants' misrepresentations
regarding the Festival experience. Plaintiffs and the Class (as defined below) have been damaged
by Defendants' deceptive, negligent, and unfair conduct and wrongful inaction in that they
purchased tickets for, and other items associated with, the Electric Zoo Festival, that they would
not have otherwise purchased had the Defendants not misrepresented the experience of attending
the Electric Zoo Festival or warned them of the potential harms caused by attending the event.

**A.     Anthony Palie**

68.     Plaintiff Anthony Palie, who at all relevant times lived in Boston, Massachusetts,
is a former event promoter who is very familiar with the world of electronic dance music and has
attended a number of electronic dance music events during the last several years.  He has

consistently looked for new and interesting musical performances to attend and eagerly anticipated attending the Electronic Zoo Festival in 2023, which he had never previously attended.

69.     In early August 2023, after reviewing promotional materials posted by Defendants concerning the Festival, Mr. Palie purchased a three-day ticket package to the Festival, costing approximately $385.  In the following lead-up to the Festival, Mr. Palie closely followed Defendants' promotions through social media, with increasing excitement, reading and sharing among his friends Defendants' posts about the Festival acts and immersive stages.

70.     In order to attend the Festival, on the night of Thursday, August 31, Mr. Palie drove with a group of three friends from Boston to New York City, where the entire group rented a hotel for their stay.  That night, Mr. Palie read Defendants' post from 10:17 PM, advising attendees to "Get your rest. We'll see you tomorrow on the island," with enthusiasm, and he and his group eagerly proceeded to make preparations for the following day.  These preparations included arriving at the Festival grounds early so that one member of their group could obtain their ticket to the Festival from the will-call line.

71.     Much to Mr. Palie's and his friends' disbelief, however, as he was preparing to attend the opening day of the Festival the next morning, he received the Defendants' cancellation notice.  Given Defendants' prior representations concerning the Festival, which included promotion of Defendants' readiness for the event and no indication of possible issues, Mr. Palie initially believed that the notice of cancellation was a hoax.  Soon, however, his disbelief gave way to frustrated resignation, as he realized that a full third of the Festival would not proceed as advertised.  The cancellation also prevented Mr. Palie's friend from picking up a will-call ticket

that day.  Even so, and despite his disappointment, Mr. Palie was encouraged by Defendants'

representation that the Festival would still go on, as scheduled, on Saturday and Sunday.

72.    This initial optimism was soon dashed, however, when, the following morning,

Saturday September 2, Mr. Palie and his friends learned through Defendants' social media

postings, that the Festival opening would be delayed by an additional two hours. Mr. Palie

subsequently made arrangements for his group of friends and him to arrive at Randall's Island at

approximately 3:30 PM.

73.    The scenes of overcrowding and disorganization that greeted Mr. Palie and his

friends at the entrance to the Festival were shocking and unprecedented in all his prior

experience attending music events.  Staff lacked basic knowledge about the Festival and were

unable or unwilling to direct or assist attendees attempting to enter.   Due to the confusion, Mr.

Palie was obliged to part ways with his friend who stood in a will-call line – ultimately for

approximately 4.5 hours – to obtain a wristband (necessary to enter the Festival and purchase any

items from vendors).  Mr. Palie was himself forced to wait more than an hour in a line just to

enter the Festival grounds.  During this period, he and other attendees were stranded in the heat

with no access to water.

74.    Thereafter, upon entering the Festival, Mr. Palie was confronted with even greater

hazards.  He observed exposed cables strewn about the Festival grounds, creating tripping

hazards; shoddily constructed viewing platforms erected by Defendants, leaving gaps in the

floorboards in which footwear would get caught or lodged; and improperly placed barricades set

up by Defendants to direct and contain crowds, which created tripping hazards to unsuspected

pedestrians.

75.     Upon information and belief, Defendants failed to supply sufficient trash receptacles to attendees.

76.     Mr. Palie estimated that he saw a total of only ten trash cans throughout the whole of the Festival grounds – causing litter to accumulate throughout the grounds.

77.     Additionally, signage at the Festival was lacking or confusing, and when Mr. Palie and his friends attempted to seek assistance from Festival staff, they were consistently greeted either with apathy and ignorance or outright belligerence.

78.     Beyond the physical hazards and confusion created by Defendants that Mr. Palie experienced, he was dismayed to find that, in sharp contrast to the elaborate and immersive stages set forth in Defendants' advertisements, the stages were bare and only partially completed. Among other things, many of the stages lacked lighting and had display screens that were either wholly or substantially inoperative.  Separately, none of the additional experiences or shops (other than food vendors) that had been promoted by Defendants were present at the Festival.

79.     Mr. Palie and his friends decided to leave the Festival on Saturday prior to the conclusion of the final musical sets.  As Mr. Palie departed the Festival grounds, he observed staff inexplicably closing the gates and barring attendees behind them from leaving.  As a result, through social media, Mr. Palie learned that thousands of attendees were trapped for hours on Randall's Island on Saturday night and into Sunday morning after the conclusion of Saturday's musical acts.

80.     The following day, Sunday, September 3, Mr. Palie arrived for the last day of the Festival at approximately 2:30 PM.  Upon entry to the Festival grounds, Mr. Palie was shocked to observe that Defendants had done little to nothing to improve the conditions over the prior day.  Cables remained exposed, garbage cans were overflowing, trash was strewn about the

grounds, and the stages remained in rudimentary stages of construction.  Additionally, Festival staff were, if anything, more aggressive and hostile toward attendees.

81.     Given the general state of neglect and disorganization at the Festival, Mr. Palie was overcome by anxiety as the crowds at the Festival began to grow.  Accordingly, at approximately 5:30 PM, he felt compelled to leave the Festival and return to his hotel.

82.     Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Mr. Palie for the Festival tickets he purchased and associated fees.

**B.     Dakota Bedell & Bridgette Winkelmann**

83.     Plaintiffs Dakota Bedell and Bridgette Winkelmann, who at all relevant times lived in Eau Claire, Wisconsin, have attended many music festivals and, as early as June 2023, began planning to attend Electric Zoo in New York with a group of friends.

84.     In July 2023, Mr. Bedell and Ms. Winkelmann bought three-day tickets to the Festival, each package costing approximately $350.   Both also bought tickets to an after-party featuring Liquid Stranger on Saturday, September 2, which was promoted by Defendants to Festival attendees and hosted at a venue owned by Defendant Avant Gardner.  The after-party tickets cost $80 each.

85.     In order to attend the Festival, Mr. Bedell and Ms. Winkelmann temporarily closed the business they own together, and, with a group of four additional friends, drove over 1,100 miles from Eau Claire to New York City, where the entire group rented an apartment for their stay.

86.     The group arrived in New York City on Thursday, August 31, the day before the Festival.  Seeing Defendants' post from 10:17 p.m. encouraging attendees to rest up for Friday, they eagerly prepared for the following day, planning to arrive at the Festival grounds early so that one member of their group could obtain their ticket to the Festival from the will-call line.

87.      Much to Mr. Bedell's and Ms. Winkelmann's consternation and dismay, however, the next morning, just as they were preparing to leave their rental apartment to travel to the Festival, they learned that Defendants had cancelled the entire first day of the Festival.  The cancellation prevented their friend from picking up a will-call ticket that day.  Even so, and despite their disappointment, Mr. Bedell and Ms. Winkelman were encouraged by Defendants' representation that the Festival would still go on, as scheduled, on Saturday and Sunday.

88.     This initial optimism was soon dashed, however, when, the following morning, Saturday, September 2, Mr. Bedell, Ms. Winkelmann, and their group of friends learned about the two-hour delay in the Festival's opening through Defendants' social media postings.

89.     Mr. Bedell and Ms. Winkelmann subsequently made arrangements with their group to arrive at Randall's Island at approximately 4:00 PM.

90.     The scenes of overcrowding and disorganization that greeted Mr. Bedell and Ms. Winkelmann at the entrance to the Festival were shocking and unprecedented in all of their prior experience attending music events.  Staff lacked basic knowledge about the Festival and were unable or unwilling to direct or assist attendees attempting to enter.   Due to the confusion, Ms. Bedell and Ms. Winkelmann were obliged to part ways with their friend who stood in a will-call line – ultimately for approximately six hours – to obtain a ticket.  Ms. Bedell and Ms. Winkelmann themselves were forced to wait for approximately two-and-a-half hours in a line just to enter the Festival grounds.

91.     Thereafter, upon entering the Festival, Mr. Bedell and Ms. Winkelmann found that many of the stages were not fully constructed and that many of the screens were not operational. Furthermore, when they attempted to use the restroom facilities indicated on the Festival maps that Defendants had provided, they found that one of the sites consisted of only a single port-a-potty that was chained closed.  At a separate site, they found limited port-a-potties that were overcrowded and lacked basic sanitation, including hand sanitizer or washing stations. Additionally, when they attempted to seek assistance from Festival staff, they were consistently greeted either with apathy and ignorance or outright hostility.

92.     Worse yet, when the last music acts completed their sets on Saturday, Festival staff failed to instruct, direct, or enable the assembled crowds on how to exit the Festival grounds.  As a result, Mr. Bedell and Ms. Winkelmann were caught in a crush of humanity as attendees chaotically attempted to leave Randall's Island.  During that time, they witnessed attendees lose consciousness or scream out for medical assistance, which was never provided. Mr. Bedell and Ms. Winkelmann were trapped for over three hours before they were ultimately able to extricate themselves from the Festival grounds.

93.     As a result of the delay, Mr. Bedell and Ms. Winkelmann missed predominantly all of the Liquid Stranger after-party hosted by Defendant Avant Gardner, for which they had pre-purchased tickets.

94.     Due to their harrowing experiences on Saturday, Mr. Bedell and Ms. Winkelmann resolved to travel earlier to the Festival on Sunday, the last day, to avoid the initial crowds.  Even so, at the start of their day they waited over two hours to enter the festival.  Limiting their use of the unsanitary bathrooms, which had only become filthier since the prior day, Mr. Bedell and Ms. Winkelmann attempted to enjoy the musical acts of the final day of the Festival; however, by

6:00 PM, they realized that, due to Defendants' lack of planning and overselling of tickets, the

Festival grounds became so overcrowded that they could no longer freely travel between the

various stages at the Festival to see their acts of choice.  With each passing hour thereafter,

movement became increasingly obstructed and conditions at the Festival increasingly hazardous.

95.     Accordingly, at approximately 9:45 PM, over one hour before the conclusion of

the Festival, Mr. Bedell and Ms. Winkelmann decided to leave for good.  Despite their efforts to

leave, however, they again found themselves trapped.  Their final experience at the Festival

consisted of desperately trying to maintain their footing amid a restive mass of humanity

struggling to leave the Festival grounds, without aid or instruction from Festival staff.  It would

take them over three hours before they were able to extricate themselves from Randall's Island.

96.     Despite Defendants' cancelation of the Friday acts, their curtailment of the

Saturday acts, their failure to deliver the experience they promised, and the chaos and panic

created by their acts and omissions on both Saturday and Sunday, Defendants have failed to

provide any refund or recompense to Mr. Bedell or Ms. Winkelmann for the Festival or after-

party tickets they purchased and associated fees.

### C.     Carl Corbo

97.     Plaintiff Carl Corbo, who at all relevant times lived in Torrington, Connecticut,

has worked in the promotion and booking industry and is very familiar with the world of

electronic dance music.  While Mr. Corbo has attended many electronic music shows in the past,

he had never before attended the Electronic Zoo Festival.

98.      In early June 2023, after reviewing promotional materials posted by Defendants

concerning the Festival, Mr. Corbo purchased a three-day ticket package to the Festival.  The

ticket package cost Mr. Corbo approximately $300.  In the subsequent months leading up to the

Festival, Mr. Corbo closely followed Defendants' promotions through social media with increasing excitement.

99.     In order to attend all three days of the Festival, Mr. Corbo took off work on Friday, September 1, 2023, to travel from Connecticut to New York City, and he booked a hotel room from Friday through Sunday.  Much to his shock and frustration, however, Mr. Corbo learned on Friday, while on a train to New York, about the cancelation of the entire first day of the Festival.  Had he known about the cancelation earlier in the day, he could have canceled his hotel room for Friday night.

100.     When Mr. Corbo arrived at the entrance to the Festival on Saturday afternoon – having seen the 11:37 AM post regarding the delayed opening and adjusting his plans accordingly – the scenes of overcrowding and disorganization that greeted him there were shocking and unprecedented in his prior experience attending music events.  Staff lacked basic knowledge about the Festival and were unable or unwilling to direct or assist attendees attempting to enter.   Due to the confusion, Mr. Corbo was forced to wait more than an hour in a line just to enter the Festival grounds.  During this period, he and other attendees were stranded in the heat with no access to water.

101.     To his further concern and dismay, upon entering the Festival grounds, Mr. Corbo found dangerous, unsanitary, and disorganized conditions, including exposed cables strewn about the Festival grounds that created tripping hazards for attendees, trash accumulated on the grounds, poor or confusing signage, sparse and unsanitary bathroom facilities, inadequate water replenishing stations, and apathetic, combative, or dishonest Festival staff, including security staff accepting bribes from attendees to bypass lines and to access restricted areas at the Festival.

102.    Mr. Corbo was also flabbergasted by Defendants' striking failures to fulfill the basic promises set forth in their promotional materials.  In sharp contrast to the elaborate and immersive stages set forth in Defendants' advertisements, the stages Defendants in fact erected at the Festival were bare and only partially completed, falling far short of the renderings advertised by Defendants: lifts and cranes were actively working on stages while artists performed, and stages lacked lighting and had display screens that were either wholly or substantially inoperative.

103.    Given both his extreme dissatisfaction and his safety concerns with respect to the conditions he observed on Saturday, Mr. Corbo left the Festival early that day in the hopes that Defendants would complete their construction and provide a presentable and safe experience the following day.  In fact, however, conditions on Sunday were even worse.

104.    Upon entry to the Festival grounds on Sunday, Mr. Corbo was shocked to find that Defendants had done nothing to improve the conditions over the prior day.  Cables remained exposed, garbage cans were overflowing, trash was strewn about the grounds, stages remained in rudimentary stages of construction, toilet facilities were overflowing and had not been replenished with hand sanitizer or toilet paper, and many water refilling stations were not functioning, leaving him with no option other than purchasing bottled water from vendors.  Mr. Corbo observed multiple people collapse at the Festival on Sunday, apparently due to heat and dehydration.

105.    Worse yet, due to Defendants' lack of planning and overselling of tickets, as evening on Sunday fell, the Festival grounds became dangerously overcrowded, causing Mr. Corbo to fear for his life.  By evening, space was so limited that Mr. Corbo was trapped in the tight crowds that Defendants had admitted but had failed to organize or control.  His final

experience at the Festival consisted of a terrifying and hours-long effort to maintain his footing to avoid being trampled, which has left him with lingering anxiety and sleeplessness, weeks after the Festival.  That experience extended hours after the last acts of the Festival concluded.

106.    After the Festival concluded, it took Mr. Corbo approximately three hours to leave Randall's Island, as he and tens of thousands of others struggled to navigate their way out of the Festival without aid or instruction from Festival staff.   Moreover, while Mr. Corbo had purchased a shuttle pass from the Festival from Defendants, he was forced to forego use of that service after Defendants made the shuttle available to all attendees at the Festival without increasing their capacity to shuttle all attendees.

107.    Upon information and belief, Defendants had hired only four school buses for the shuttle service.

108.    As a result, after waiting in line for a shuttle for approximately two hours, Mr. Corbo relented and navigated the crowds to depart Randall's Island by foot, which took approximately one hour.  He then hired an Uber to take him back to his hotel.

109.    Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Mr. Corbo for the Festival tickets and the shuttle passes he purchased, and any associated fees.

**D.    Annabel Gould**

110.    Plaintiff Annabel Gould, who at all relevant times lived New York City, New York, is a college student who is very familiar with the world of electronic dance music and previously attended an Electronic Zoo music festival at Randall's Island in 2021.

111.    On or around May 26, 2023, after reviewing promotional materials posted by Defendants concerning the Festival, Ms. Gould purchased a three-day ticket package to the Festival, costing approximately $230.

112.    In the intervening months, Ms. Gould followed, with increasing excitement, Defendants' promotion of the Festival through social media, including their final post the night before the first day of the Festival, advising attendees to "Get your rest" in anticipation of Friday's opening day.  Ms. Gould was therefore shocked and disappointed to learn the following morning, just hours before the opening acts were scheduled to perform, that Defendants had cancelled the entire first day of the Festival.

113.    When Ms. Gould arrived at Randall's Island on Saturday afternoon, she was astonished by the marked differences she observed at the Festival compared to her prior experience attending in 2021.  Staff lacked basic knowledge about the Festival and were unable or unwilling to direct or assist attendees attempting to enter; signage was lacking or confusing; and crowds were significantly larger.  As a result, large bottlenecks formed throughout the Festival, including hour-long delays entering the Festival after its gates opened and departing the Festival after the last musical acts concluded.  Additionally, in contrast to her experience in 2021, the Festival lacked adequate bathroom facilities and water replenishing stations.

114.    Most striking of all, however, was the yawning gap between the immersive sound and stage experiences that Defendants had advertised compared to what they provided in fact. Among other things, the main stage of the Festival was initially closed as the Festival opened on Saturday, and even thereafter, all of the Festival stages fell far short of the renderings advertised by Defendants: lifts and cranes were actively working on stages while artists performed, and

stages lacked lighting and had display screens that were either wholly or substantially inoperative and glitchy.

115.     Finally, after the musical acts on Saturday concluded, Ms. Gould was trapped for hours in a crush of humanity as attendees chaotically attempted to leave the Festival Grounds and Randall's Island without the aid or assistance of Festival staff.   Fearing for her safety, all Ms. Gould could do was try to maintain her balance and avoid being trampled as the confused crowds struggled to leave.

116.     The following day, Sunday, September 3, Ms. Gould decided to attend the Festival commencing later in the day.  She began her trip to Randall's Island from the Upper East Side at approximately 6:00 PM.  Enroute to the Festival, however, she learned – via a social media message posted by Defendants at 6:35 PM – that Defendants would cease admitting additional attendees to the Festival because it had reached capacity.  Defendants cited "the challenges caused by Friday [sic] cancellation" as an explanation for this fact.  Accordingly, Ms. Gould was left with no choice but to go back home.

117.      Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their constructive cancellation of Sunday's acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on Saturday, Defendants have failed to provide any refund or recompense to Ms. Gould for the tickets she purchased and any related fees.

**E.     Dolores Thompson**

118.     Plaintiff Dolores Thompson, who at all relevant times lived in Kissimmee, Florida, is a health care worker who has attended a number of music festivals, including, on occasion, purchasing "VIP" packages that offer access to additional or expanded amenities.   She

has consistently looked for new and interesting music events to attend and eagerly looked forward to attending the Electronic Zoo Festival in 2023, which she had not previously attended.

119.    Several months before the Festival, after reviewing promotional materials posted by Defendants, Ms. Thompson purchased a three-day VIP ticket package to the Festival, as well as a shuttle pass service from Brooklyn to Randall's Island offered by Defendants.  In all, the ticket package and shuttle pass cost Ms. Thompson approximately $780.

120.    Among the amenities Defendants advertised as included with the VIP ticket package that Ms. Thompson purchased were: (i) premium entrance to the Festival skipping the entry queue, (ii) premium viewing galleries of all six of the Festival stages; (iii) access to VIP flush toilets; (iv) complimentary cell phone charging stations, (v) complimentary hors d'oeuvres, and (vi) an onsite host for VIP guests.  As described in the paragraph below, Defendants not only failed to provide the advertised VIP amenities, their actions and omissions also caused Ms. Thompson to miss a significant number of Festival acts and created noxious and/or hazardous conditions that made it impossible to reasonably enjoy the remainder of the acts.

121.    In order to attend every day of the Festival, Ms. Thompson flew from Florida to New York City and booked a hotel room from Thursday, August 31, through the entire Labor Day weekend.  Much to her shock and frustration, however, Ms. Thompson discovered the following day, September 1, that Defendants had cancelled the entire first day of the Festival.

122.    Ms. Thompson learned about Defendants' 11:37 a.m. post on Saturday morning, less than two hours before Saturday's scheduled opening, in time to delay her travel to the Festival.

123.    Ms. Thompson travelled to the Festival that afternoon, but upon arriving at Randall's Island, and despite being promised a designated VIP check-in with expedited entry to

the Festival grounds, she was directed to wait in line for multiple hours before being admitted to the Festival.   To her shock and dismay, upon entering the Festival grounds, Ms. Thompson found dangerous and disorganized conditions, including exposed cables strewn about the Festival grounds that created tripping hazards for attendees, trash accumulated on the grounds, unsanitary port-a-potties without toilet paper or hand-sanitizer, poor or confusing signage, and untrained staff.

124.     Beyond the dangerous and disorganized conditions created by Defendants at the Festival were also striking failures to fulfill the basic promises set forth in their promotional materials.  In sharp contrast to the elaborate and immersive stages set forth in Defendants' advertisements, the stages Defendants in fact erected at the Festival were bare and only partially completed.  Initially, the main stage of the Festival was closed as construction continued on it, but even thereafter, all of the Festival stages fell far short of the renderings advertised by Defendants: lifts and cranes were actively working on stages while artists performed, and stages lacked lighting and had display screens that were either wholly or substantially inoperative.

125.     Defendants also failed to fulfill their promises with respect to the VIP amenities they had advertised and sold to Ms. Thompson.

(a) First, as noted above, Defendants failed to provide a VIP check-in on Saturday.

(b) Second, while Defendants promised premium views of all of the Festival stages to VIP guests, multiple stages lacked any VIP viewing areas.

(c) Third, while Defendants promoted flush toilets to VIP guests, in fact, toilets were available at only one stage and fell woefully short of the necessary capacity required for the number of attendees.

    (d)  Fourth, while Defendants had promised complimentary electronic charging stations to VIPs, they failed to provide these, except to patrons who paid an additional fee to obtain lockers at other specified stations.

    (e)  Fifth, while Defendants had promised complimentary hors d'oeuvres to VIP guests, no complimentary food of any kind was provided, and VIP guests were instead directed to paid food vendors.

    (f)  Finally, while Defendants had promised an on-site VIP host, they failed to provide any concierge services.  Instead, the VIP areas were manned by security staff whom Ms. Thompson observed taking bribes and admitting general admission guests.  This, of course, served only to overcrowd the VIP areas and to defeat the purpose of the special amenities for which Ms. Thompson had paid.

126.    Ms. Thompson's last day at the Festival, on Sunday, September 3, was the culmination of the miseries she had experienced over the prior two days.  Upon entry to the Festival grounds on Sunday, Ms. Thompson was shocked to observe that Defendants had done little to nothing to improve the conditions over the prior day.  Cables remained exposed, garbage cans were overflowing, trash was strewn about the grounds, stages remained in rudimentary stages of construction, port-a-potties had not been cleaned or replenished with hand sanitizer or toilet paper, and water refilling stations began to malfunction.

127.    Ms. Thompson observed multiple people collapse at the Festival on Sunday, and even provided aid to one attendee who apparently had become dehydrated.  Moreover, due to the intolerable conditions, and despite having no prior history of anxiety, Ms. Thompson suffered an

anxiety attack and was forced to make her way in the overcrowded grounds to the VIP rest area near the main stage.

128.    Worse yet, due to Defendants' lack of planning and overselling of tickets, as evening on Sunday fell, the Festival grounds became extremely overcrowded, such that Ms. Thompson was no longer able to freely travel among the various stages at the Festival to see her acts of choice.  Soon, movement became wholly obstructed and Festival attendees jostled for space and balance, creating dangerous and chaotic conditions.

129.    Ms. Thompson's last experience of the Festival consisted of desperately trying to manage her anxiety amid restive crowds of attendees struggling to leave the Festival grounds without aid or instruction from Festival staff.  Moreover, while Ms. Thompson had purchased a three-day shuttle pass from the Festival from Defendants, Defendants ultimately – and without prior notice – chose to make the shuttle service available to all attendees at the Festival. Accordingly, as the Festival concluded on Sunday, instead of benefiting from this additional perk, Ms. Thompson was forced to wait for hours with thousands of other attendees attempting to utilize it.  Due to the extended delay, Ms. Thompson finally chose to forego the service altogether and hired an Uber to travel to an (oversold) afterparty in Brooklyn for which she had previously purchased tickets from Defendants.

130.    Despite Defendants' cancelation of the Friday acts, their curtailment of the Saturday acts, their failure to deliver the experience they promised, and the chaos and panic created by their acts and omissions on both Saturday and Sunday, Defendants have failed to provide any refund or recompense to Ms. Thompson for the Festival tickets, VIP benefits, after-party tickets she purchased, and any related fees.

## CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(b (2) and (b) (3), as applicable, and (c)(4). Upon information and belief, the Defendants sold thousands of Electric Zoo Festival tickets. The advertising and representations for the Electric Zoo Festival tickets and associated items were uniform throughout the class period.

132.    Pursuant to Fed. R. Civ. P. 23(b) (2) and (b) (3), as applicable, and (c)(4), Plaintiffs seek certification of the following class: All persons who purchased tickets to and/or attended the Electric Zoo Festival (the "Class").

133.    Excluded from the Class are persons who purchased the tickets for purposes of resale; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families. Plaintiffs reserve the right to redefine the proposed Class if discovery and further investigation reveal that the Class should be expanded or otherwise modified. Plaintiffs reserve the right to establish subclasses as appropriate.

134.    This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. Rule 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable. This action satisfies the predominance, typicality, numerosity, superiority, and adequacy requirements of these provisions.

(a)    **Numerosity**: The Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class members is

unknown to Plaintiffs at this time, upon information and belief, approximately 40,000 people purchased tickets for, and/or attended, the Electric Zoo Festival.

(b)      **Commonality**: Common questions of law and fact exist as to all members of the plaintiff class and predominate over any questions that affect only individual members of the Class. The common questions of law and fact include, but are not limited to:

i.   Whether Defendants made false representations about the Electric Zoo Festival, including misrepresenting the musical acts that would perform at the Electric Zoo Festival, and concealed, suppressed and omitted material facts, such as the Festival's inadequate infrastructure and staffing, and the lack of preparedness to accommodate persons at the Electric Zoo Festival, and whether Defendants created an unsafe environment for attendees, including by overselling the event;

ii.  If so, whether Defendants knew or should have known that their representations were false or were reckless as to their veracity at the time they were made and their omissions material;

iii. Whether Defendants negligently misrepresented various facts regarding the Electric Zoo Festival or were otherwise negligent or grossly negligent;

iv.  Whether Defendants breached any implied or explicit contractual obligations to ticket buyers and to attendees of Electric Zoo Festival;

v.   Whether Defendants violated various consumer protection statutes;

vi.  Whether Defendants created an unsafe environment at the Electric Zoo Festival; and

vii. Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class are entitled to damages, restitution and/or other remedies to which Class members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

(c)      **Typicality**: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' wrongful and fraudulent conduct as alleged herein.

(d)    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interest that is adverse to the interests of the other Class Members.

(e)    **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and substantially more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Negligence)

135.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

136.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

137.    Defendants owed duties to Plaintiffs and the members of the Class as paying customers and attendees of the Electric Zoo Festival to use reasonable care to provide the musical acts as advertised; to sell tickets to the number of attendees appropriate to the venue, *i.e.*, not to oversell the Festival; and to provide a safe and reliable environment, free of overcrowding

and with adequate numbers of properly trained staff; and ample water, restroom facilities, shelter, and security.

138.    These duties existed because Plaintiffs and the members of the Class were the foreseeable and probable victims of the unsafe and inadequate environment that Defendants created through their logistical and organizational failures, including their deliberate overselling of tickets beyond the planned and permitted capacity of the Festival, and their failure to operate the Festival according to the planned and advertised schedule.

139.    Defendants' duties also arose from their position of having unique and superior knowledge about the environment at the Electric Zoo Festival. They had a duty to Plaintiffs and the members of the Class to limit the number of attendees to the capacity listed in their permits approved by New York City, rather than overselling the event; and to provide Plaintiffs and the members of the Class safe conditions with adequate security and sanitary conditions, such as access to drinking water and functioning port-a-potties.

140.    Defendants also had a duty to Plaintiffs and the members of the Class to take reasonable measures to ensure that the Festival proceeded according to plan, *i.e.*, that it opened as scheduled on each day and enabled patrons to gain entry for the days for which they had purchased tickets, and to sell tickets in accordance with the venue's planned and permitted capacity, not oversell the tickets.

141.    These duties are independent of and extraneous to any contractual obligations that may exist between Defendants and Plaintiffs and the members of the Class.

142.    Defendants breached their duties to Plaintiffs and the members of the Class by failing to open the Festival at all on Friday, September 1, 2023, opening the gates two hours late on Saturday, September 2, 2023, and closing the gates to ticketholders at approximately 7:30 PM

on Sunday, September 3, 2023, despite the Festival being scheduled to run until 11:00 PM; and by overselling the event.

143.     Defendants also breached their duties to Plaintiffs and the members of the Class by failing to provide requisite sanitary and health facilities, such as access to water and functioning port-a-potties; failing to use reasonable care in properly organizing the Electric Zoo Festival with the proper vendors and staff; and placing attendees into a dangerous environment.

144.     Plaintiffs and the members of the Class suffered foreseeable pecuniary damages associated with the Electric Zoo Festival.

145.     But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and members of the Class, Plaintiffs and the members of the Class would not have suffered pecuniary damages.

146.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the members of the Class incurred pecuniary damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Gross Negligence)

147.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

148.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

149.     Defendants owed duties to Plaintiffs and the members of the Class as paying customers and attendees of the Electric Zoo Festival to use reasonable care to provide the musical acts as advertised; to sell tickets to the number of attendees appropriate to the venue, *i.e.*, not to oversell the Festival; and to provide a safe and reliable environment, free of overcrowding, and affording ample water, restroom facilities, shelter, and security at the Electric Zoo Festival.

150.     These duties existed because Plaintiffs and the members of the Class were the foreseeable and probable victims of the unsafe and inadequate environment that Defendants created through their logistical and organizational failures, including their deliberate overselling of tickets beyond the planned and permitted capacity of the Festival, and the failure to operate the Festival according to the planned and advertised schedule.

151.     Defendants' duties also arose from their position of having unique and superior knowledge about the environment at the Electric Zoo Festival.  They had a duty to Plaintiffs and the members of the Class to limit the number of attendees to the capacity listed in their permits approved by New York City, and not oversell the event; and to provide Plaintiffs and members of the Class safe conditions with adequate security and sanitary conditions, such as access to drinking water and functioning port-a-potties.

152.     Defendants also had a duty to Plaintiffs and the members of the Class to take reasonable measures to ensure that the Festival proceeded according to plan, *i.e.*, that it opened as scheduled on each day and enabled patrons to gain entry for the days for which they had purchased tickets, and to sell tickets in accordance with the venue's planned and permitted capacity, rather than overselling the tickets.

153.     These duties are independent of and extraneous to any contractual obligations that may exist between Defendants and Plaintiffs and the members of the Class.

154.     Defendants breached their duties to Plaintiffs and the members of the Class by failing to open the Festival at all on Friday, September 1, 2023, opening the gates two hours late on Saturday, September 2, 2023, and closing the gates to ticketholders at approximately 7:30 PM on Sunday, September 3, 2023, despite the Festival being scheduled to run until 11:00 PM; and by overselling the event.

155.    Defendants also breached their duties by failing to provide to Plaintiffs and the members of the Class requisite sanitary and health facilities, such as access to water and functioning port-a-potties; failing to use reasonable care in properly organizing Electric Zoo Festival with the proper vendors and staff; and placing attendees into a dangerous environment.

156.    Plaintiffs and the members of the Class suffered foreseeable pecuniary and non-pecuniary damages associated with the Electric Zoo Festival.

157.    But for Defendants' wrongful and grossly negligent breach of their duties owed to the Plaintiffs and the members of the Class, Plaintiffs and the members of the Class would not have suffered pecuniary and non-pecuniary damages.

158.    Defendants' acts and omissions were wanton and in disregard of the rights of Plaintiffs and members of the Class. Defendants knowingly and deliberately placed Plaintiffs and the members of the Class in an inadequate or unsafe environment without adequate provisions.

159.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the members of the Class incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Fraud)

160.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

161.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

162.    As alleged herein, Defendants made numerous false representations of material fact with regard to the Electric Zoo Festival.

163.    Specifically, Defendants represented, among other things, that: (1) musical acts, such as, without limitation, Deadmau5, Zedd, Gryffin, Marshmello, Kaskade, and Griz, among others, would be performing as advertised from 3:00 PM to 11:00 PM on Friday, September 1, 2023, and from 1:00 PM to 11:00 PM on Saturday and Sunday September 2-3, 2023; (2) immersive, ground-breaking multi-media stages, featuring elaborate sets, lighting, pyrotechnics, and other effects; (3) a range of vendors and artists; and (4) facilities for safety and hygiene, *e.g.*, free water stations and a sufficient number of properly maintained port-a-potties.

164.    Defendants' representations were false when made.

165.    Defendants knew these representations were false when made, and at the time of making these representations, Defendants knew that they could not and would not provide the goods and services that they had represented to Plaintiffs and the Class.  The representations made by the Defendants were made with a preconceived and undisclosed intention to not perform them.

166.    Defendants intended that the representations would induce the consuming public, including Plaintiffs and the Class, to act on these representations and to, among other things, purchase tickets to Electric Zoo Festival and incur other related expenses in connection with the Electric Zoo Festival.

167.    Defendants also concealed, suppressed and omitted material facts to Plaintiffs and the Class, that Defendants had a duty to ticketholders and attendees to disclose, including, among other things, that they had oversold the Festival by approximately 7,000 tickets, creating overcrowding that itself generated a host of additional problems; that they had not hired enough security staff, and those that were hired were inadequately trained; that they had not adequately

prepared for and provided water, sanitation, and other provisions at the Electric Zoo Festival, and that Defendants had created an unsafe environment at the Electric Zoo Festival.

168.    Plaintiffs and the Class acted in reliance on the false, material misrepresentations and omissions made by Defendants, by buying tickets associated with the Electric Zoo Festival, which caused them injury.

169.    Plaintiffs and the members of the Class would not have purchased tickets and/or expended any other money in connection with the Electric Zoo Festival if they had known that they were not going to be receiving the security, accommodations, performances, and other amenities they were told they were going to have access to at the Electric Zoo Festival.

170.    Plaintiffs and the members of the Class were consequently injured when Defendants' disorganized planning led to the cancellation of the entire day's events for Friday, September 1, 2023; a two-hour delay in opening the grounds on Saturday, September 2, 2023; overcrowding and lack of adequate staffing leading to waits of several hours to get through the entry points of the Festival on Saturday, September 2, 2023; under-preparation, insufficient staffing, and inadequate facilities leading to unsanitary and dangerous conditions once in the Festival; and closing the Festival to additional concertgoers on Sunday afternoon, leading to the crush of thousands of individuals rushing through the Festival gates.

171.    Additionally, Plaintiffs and the Class did not receive the security, accommodations, performances, and other amenities they were told they were going to have access to at the Electric Zoo Festival.

172.    As a result of Defendants' fraudulent representations and omissions, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

173.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

174.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

175.    As alleged herein, Defendants made numerous false representations of material fact with regard to the Electric Zoo Festival.

176.    Specifically, Defendants represented, among other things, that: (1) musical acts, such as, without limitation, Deadmau5, Zedd, Gryffin, Marshmello, Kaskade, and Griz, among others, would be performing as advertised from 3:00 PM to 11:00 PM on Friday, September 1, 2023, and from 1:00 PM to 11:00 PM on Saturday and Sunday September 2-3, 2023; (2) immersive, ground-breaking multi-media stages, featuring elaborate sets, lighting, pyrotechnics, and other effects; (3) a range of vendors and artists; and (4) facilities for safety and hygiene, *e.g.*, free water stations and a sufficient number of properly maintained port-a-potties.

177.    Defendants' representations were false at the time that they were made.

178.    Defendants were negligent in making the representations because they should have known the representations were false. Defendants should have known that they could not and would not provide the goods and services that they had represented to Plaintiffs and consumers.

179.    Defendants intended for the representations to induce the consuming public, including Plaintiffs and the Class, to act on these representations and to, among other things, purchase tickets to Electric Zoo Festival and incur other related expenses in connection with the Electric Zoo Festival.

180.    Plaintiffs and the members of the Class acted in reliance on the false, material representations made by Defendants, by buying tickets associated with the Electric Zoo Festival, which caused them injury. Plaintiffs and the members of the Class would not have purchased tickets and/or expended any other money in connection with the Electric Zoo Festival if they had known that they were not going to be receiving the security, accommodations, performances, and other amenities they were told they were going to have access to at the Electric Zoo Festival.

181.    Plaintiffs and the members of the Class were consequently injured when Electric Zoo Festival's lack of adequate staffing led to cancellation of the first day's performances; a two-hour delay in opening the grounds on Saturday, September 2, 2023 overcrowding and lack of adequate staffing leading to waits of several hours to get through the entry points of the Festival on Saturday, September 2, 2023; under-preparation, insufficient staffing, and inadequate facilities leading to unsanitary and dangerous conditions once in the Festival; and closing the Festival to additional concertgoers on Sunday afternoon, leading to the crush of thousands of individuals rushing through the Festival gates.

182.    Additionally, Plaintiffs and the Class did not receive the security, accommodations, performances, and other amenities they were told they were going to have access to at the Electric Zoo Festival.

183.    As a result of Defendants' negligent misrepresentations, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract)**

184.    Plaintiffs reallege and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

185.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

186.    Plaintiffs and the members of the Class who purchased tickets for single or multi-day admission to the Festival entered into valid and enforceable implied contracts with Defendants to provide, in exchange for money, a premiere musical festival, free from unreasonably noxious and unsafe conditions, on Friday, September 1, 2023 from 3:00 PM to 11:00PM, Saturday, September 2, 2023 from 1:00 PM to 11:00 PM, and/or Sunday September 3, 2023 from 1:00 PM to 11:00 PM.

187.    Additionally, Plaintiffs and the members of the Class who purchased additional amenities and services for the Festival, including, among other things, access to ferry and shuttle services and VIP viewing areas, entered into valid and enforceable implied contracts with Defendants to provide, in exchange for money, the amenities as advertised.

188.    Plaintiffs and all other members of the class fully performed under the contracts by paying valuable consideration to Defendants.

189.    As alleged herein, Defendants breached the contracts with Plaintiffs and the members of the Class by, among other things, failing to provide access to the Festival's first day; delaying the opening of the Festival on the second day; barring ticket holders from entering the third day of the Festival; creating noxious and unsafe conditions throughout the Festival; failing to provide adequate staffing, sufficiently accessible water and functioning port-a-potties; cancelling specified musical acts; failing to provide reasonable access to means for a timely departure; and failing to provide the promised amenities to Plaintiffs and the members of the Class who paid for them.

190.     Plaintiffs and the members of the Class expended money to purchase their tickets and/or associated items with the Electric Zoo Festival.

191.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

192.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

193.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

194.     Plaintiffs and the members of the Class who purchased tickets for single or multi-day admission to the Festival entered into valid and enforceable implied contracts with Defendants to provide, in exchange for money, a premier  musical festival, free from unreasonably noxious and unsafe conditions, on Friday, September 1, 2023 from 3:00 PM to 11:00PM, Saturday, September 2, 2023 from 1:00 PM to 11:00 PM, and/or Sunday September 3, 2023 from 1:00 PM to 11:00 PM. Plaintiffs who purchased tickets to Electric Zoo Festival provided payment in consideration for Defendants' promise to provide a safe and secure music festival with specified musical performers, and otherwise fully performed their obligations under the contracts.

195.     Additionally, Plaintiffs and the members of the Class who purchased additional amenities and services for the Festival, including, among other things, access to ferry and shuttle services and VIP viewing areas, entered into valid and enforceable implied contracts with Defendants to provide, in exchange for money, the amenities as advertised.

196.    As alleged herein, Defendants' acts and omissions, by failing to provide access to the Festival's first day, September 1, 2023; delaying the opening by two hours on the second day, September 2, 2023; barring ticket holders from entering the third day of the Festival; creating noxious and unsafe conditions throughout the Festival; failing to provide adequate staffing, sufficiently accessible water and functioning port-a-potties, cancelling specified musical acts, failing to provide reasonable access to means to effect a timely departure; and failing to provide the promised amenities to Plaintiffs and the members of the Class who paid for them interfered with the rights of Plaintiffs and the members of the Class to receive the benefits of the contracts and constituted a breach of its duty of good faith with Plaintiffs and members of the Class.

197.    Plaintiffs and the members of the Class expended money to purchase their tickets and other items associated with the Electric Zoo Festival.

198.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

199.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

200.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

201.    By their wrongful acts and omissions regarding the Electric Zoo Festival, as discussed above, Defendants were unjustly enriched at the expense of Plaintiffs and the members of the Class, who did not receive the benefit for which they were promised and they were entitled

– as alleged in detail above – for attendance to the advertised  Festival, and thus, Plaintiffs and the members of the Class were unjustly deprived.

202.    Defendants were enriched by, among other things, the financial benefit from sales of tickets to, and associated items for, the Electric Zoo Festival, and for services they were supposed to but not did provide.

203.    It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation it obtained from its deceptive, misleading, and unlawful conduct alleged herein.

204.    Plaintiffs and the members of the Class seek restitution from Defendants and disgorgement by Defendants of all profits, benefits, and other compensation obtained through their wrongful conduct.

**EIGHTH CAUSE OF ACTION**
**(Violation of N.Y. Gen Bus. Law § 349, *et seq*.)**

205.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

206.    Plaintiffs bring this cause of action on behalf of themselves and all of the members of the Class as the deceptive practices with respect to the entire Class occurred in and emanated from New York, where Defendants and their founders were headquartered, conducted business and/or had extensive ties.

207.    Plaintiffs and members of the Class are individuals that paid for Electric Zoo Festival tickets and other associated items with the Electric Zoo Festival for personal purposes.

208.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Law § 349 in the promotion of the Electric Zoo Festival and sale of the Electric Zoo Festival tickets and other

associated items with the Electric Zoo Festival, including by misrepresenting the characteristics, and qualities of the Electric Zoo Festival as alleged herein, such as representing that: (1) musical acts, such as, without limitation, Deadmau5, Zedd, Gryffin, Marshmello, Kaskade, and Griz, among others, would be performing as advertised from 3:00 PM to 11:00 PM on Friday, September 1, 2023, and from 1:00 PM to 11:00 PM on Saturday and Sunday September 2-3, 2023; (2) immersive, ground-breaking multi-media stages, featuring elaborate sets, lighting, pyrotechnics, and other effects; (3) a range of vendors and artists; and (4) facilities for safety and hygiene, *e.g.*, free water stations and a sufficient number of properly maintained port-a-potties.

209.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 by concealing, suppressing and omitting material facts, including, among other things, about the lack of preparedness, sanitation, and other provisions at the Electric Zoo Festival, and that Defendants had created an unsafe environment at the Electric Zoo Festival.

210.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the characteristics and quality of the Electric Zoo Festival.

211.    Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs and the rights of the Plaintiffs and the Class.

212.    As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiffs and the members of the Class have suffered and will continue to suffer injury and damages.

213.     Defendants' deceptive and unlawful acts and practices complained of herein, affected the public interest and consumers at large.

214.     The above deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiffs and the members of the Class that they could not reasonably avoid.

215.     Plaintiffs and members of the Class seek all monetary and non-monetary relief allowed by law, including, per class member, actual damages or statutory damages of $50 (whichever is greater), treble damages, attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and the undersigned counsel as Class Counsel to represent the Class;

B.     For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.     For an order finding in favor of Plaintiffs and the Class on all causes of action asserted herein;

D.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief; and

G.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: New York, New York
September 22, 2023

**TRIEF & OLK**

By: _/s/ Shelly L. Friedland_
Shelly L. Friedland
Eyal Dror
750 Third Avenue, Suite 2902
New York, NY 10017
Tel: (212) 486-6060
sfriedland@triefandolk.com
edror@triefandolk.com
*Counsel for Plaintiffs on behalf of*
*themselves and all others similarly situated*